**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MEREDITH FAW, individually and on behalf of all others similarly situated,**<br>**Plaintiff,**<br>**v.**<br>**VILLANOVA UNIVERSITY,**<br>**Defendant.** | **CIVIL ACTION NO. 23-3897** |

**MEMORANDUM OPINION**

**Rufe, J.** **September 14, 2026**

In this putative class action, Plaintiff Meredith Faw proceeds against Villanova University to recover tuition and fee payments that Villanova charged and retained despite its transition to remote learning during the COVID-19 pandemic. Before the Court are three motions: Plaintiff's Motion for Class Certification; Defendant's Motion to Exclude the Testimony of Plaintiff's expert witness, Dr. Gareth Macartney; and Defendant's Motion for Summary Judgment. For the reasons below, Defendant's Motion for Summary Judgment will be granted. As a consequence, the Court will dismiss as moot Defendant's Motion to Exclude and Plaintiff's Motion for Class Certification.

# I. Background[1]

## A. The Parties

Villanova University, founded in 1842, is a private university in Delaware County, Pennsylvania.[2] It offers numerous undergraduate and graduate degree programs.[3] Further, Villanova has a history of providing in-person education.[4] Prior to the Spring 2020 semester, Villanova's undergraduate students could take certain courses online, though they were generally unable to pursue a curriculum that was fully remote.[5] Some graduate programs at Villanova, by contrast, were operated solely online even before Spring 2020.[6]

Villanova's tradition of in-person education is apparent from its materials and student programming. In promotional materials, Villanova emphasizes its campus access, student community, physical spaces, and geographic location.[7] Villanova also hosts an admitted students' day to encourage graduating high schoolers to visit and learn about academic

---

[1] The Court recounts the facts by drawing from (1) the statements of undisputed material facts, (2) the documentary and testimonial evidence in the summary judgment record, and (3) allegations in the Complaint, to the extent they have been admitted by Villanova. Any facts in dispute are noted. When the Court turns to its analysis, evidence will be viewed in the light most favorable to Plaintiff, and justifiable inferences will be made in her favor. *See Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] Pl's. Resp. Def.'s Statement of Undisputed Material Facts & Pl.'s Concise Statement of Additional Facts ("Resp. DSUMF") ¶ 1 [Doc. No. 42-1].

[3] Resp. DSUMF ¶ 2 [Doc. No. 42-1].

[4] Def.'s Resp. Pl.'s Concise Statement of Additional Material Facts ("Resp. PSUMF") ¶ 1 [Doc. No. 45-3].

[5] Resp. DSUMF ¶ 33 [Doc. No. 42-1]; Pl.'s Summ. J. Ex. A at 45:16-19 [Doc. No. 42-3]. The record demonstrates some nuance with respect to online education for undergraduates. Craig Wheeland, Villanova's former Senior Vice Provost for Academics, identified as an exception that the "bachelor of interdisciplinary studies" program was offered in a purely online format prior to Spring 2020. Def.'s Summ. J. Ex. 2 at 39:3-14 [Doc. No. 38-4]. However, Professor Wheeland said that undergraduates could not pursue fully remote education in the Fall 2019 semester. Pl.'s Summ. J. Ex. A at 45:16-19 [Doc. No. 42-3] ("Q Okay. So for the – in the fall of 2019 semester, if an undergraduate wanted to take all of their classes online, could they? A No.").

[6] Def.'s Summ. J. Ex. 3 at 23:4-14 [Doc. No. 38-5].

[7] *E.g.*, Pl.'s Summ. J. Ex. B at VU_00003286 [Doc. No. 42-4]; *id.* Ex. C at VU_00003452, VU_00003459 [Doc. No. 42-5]; *id.* Ex. F at VU_00003190, VU_00003191 [Doc. No. 42-8].

departments and student services, helping them compare Villanova to other institutions.[8] As a general practice, first-year students at Villanova reside on campus.[9]

Plaintiff was a sophomore at Villanova during the Spring 2020 semester and lived on campus.[10] Until Spring 2020, Plaintiff's experience with Villanova was informed by on-campus interactions. As a child, she visited the campus with her father, a Villanova alumnus, and attended basketball games.[11] When it came time for her college search, Plaintiff participated in an in-person tour of Villanova's campus and learned about the on-campus experience from a tour guide.[12] Villanova was Plaintiff's "dream school" because of its sports program, community ideals, and strong academic reputation.[13] As a Villanova student, Plaintiff participated in on-campus clubs and activities like the intramural basketball team, club swim, and Villanova's Division 1 Mascot Team.[14] She also utilized the Davis Fitness Center and the Falvey Library Writing Center for tutoring services.[15]

**B. COVID-19 Disrupts the Spring 2020 Semester**

Villanova's Spring 2020 semester began on January 13, 2020, with final exams to conclude in early May 2020.[16] The listed cost for the Spring 2020 semester was $27,275 in

---

[8] Resp. PSUMF ¶ 6 [Doc. No. 45-3]; Pl.'s Summ. J. Ex. A at 55:24-56:22 [Doc. No. 42-3].

[9] Resp. PSUMF ¶ 7 [Doc. No. 45-3].

[10] Resp. DSUMF ¶ 22 [Doc. No. 42-1].

[11] Resp. PSUMF ¶ 9 [Doc. No. 45-3].

[12] *Id.*

[13] Resp. DSUMF ¶¶ 5-7 [Doc. No. 42-1].

[14] Resp. PSUMF ¶ 11 [Doc. No. 45-3].

[15] *Id.*

[16] *See* Compl. ¶ 15 [Doc. No. 1]; Am. Answer ¶ 15 [Doc. No. 25].

tuition, plus a $180 General Fee and a $185 Health and Wellness Fee.[17] Plaintiff obtained the funds for her tuition and fees from her father, though the parties dispute the relevance of this.[18] She also received a scholarship of $2,000 from Upper Merion Township for the Spring 2020 semester.[19]

The spread of COVID-19 brought about significant change. On March 6, Pennsylvania Governor Tom Wolf declared a disaster emergency throughout the Commonwealth.[20] As the situation worsened, the President of Villanova announced, on March 11, that in-person classes would be suspended beginning March 16.[21] The transition to online instruction was supposed to be temporary, with the President noting, "We will continue to monitor and evaluate the situation, and will decide no later than Friday, April 3, whether to resume in-person classes."[22] However, once Governor Wolf shut down Pennsylvania schools for two weeks, Villanova took more action, announcing that students were required to leave campus no later than March 15.[23]

On March 19, Governor Wolf issued an Executive Order requiring closure of any business that was not "life sustaining."[24] The Order added that its provisions were "effective immediately" and "in effect until further notice."[25] Governor Wolf later issued a March 23

---

[17] Resp. DSUMF ¶ 31 [Doc. No. 42-1]. These listed costs did not necessarily equate to what Villanova received from each student or what Plaintiff or other putative class members paid. Resp. DSUMF ¶ 38 [Doc. No. 42-1]. The two fees are referenced in the record as the "Mandatory Fees."

[18] Def.'s Summ. J. Ex. 1 at 38:23-40:41 [Doc. No. 38-3]; Resp. DSUMF ¶¶ 22, 40 [Doc. No. 42-1].

[19] Resp. DSUMF ¶ 22 [Doc. No. 42-1].

[20] Def.'s Summ J. Ex. 10 [Doc. No. 38-12]; *see* 35 Pa. Cons. Stat. § 7301(c).

[21] Resp. DSUMF ¶ 15 [Doc. No. 42-1]; Def.'s Summ. J. Ex. 8 [Doc. No. 38-10].

[22] Def.'s Summ. J. Ex. 8 [Doc. No. 38-10].

[23] Resp. DSUMF ¶ 15 [Doc. No. 42-1]; Def.'s Summ. J. Ex. 9 [Doc. No. 38-11].

[24] Def.'s Summ. J. Ex. 10 § 1 [Doc. No. 38-12].

[25] *Id.* § 3.

stay-at-home order, subject to certain exceptions,[26] for "[a]ll individuals residing in . . . Delaware County."[27] The same day, the President of Villanova informed community members that classes would be conducted online for the remainder of Spring 2020.[28] The President of Villanova explained that on-campus events would be canceled and that student services would continue to be provided by the university's support offices.[29] Villanova remained under shutdown through the remainder of the semester, with no in-person instruction.[30]

Due to the truncated in-person semester, Villanova issued prorated refunds to students for room and board costs.[31] Villanova did not provide a refund of tuition or fee payments despite the transition to remote learning in Spring 2020.[32]

Like many students, Plaintiff continued her studies online amidst the turmoil. She completed her coursework for the Spring 2020 semester and earned 18 academic credits,[33] despite reporting that the quality of education decreased due to remote learning.[34] Plaintiff then re-enrolled at Villanova for the Fall 2020 semester.[35] The President of Villanova indicated on August 20, 2020, that the Fall 2020 semester would follow a hybrid structure, with "residence

---

[26] The stay-at-home order did not apply to, *inter alia*, "life sustaining businesses" and limited outdoor activities. Def.'s Summ. J. Ex. 14 § 1 [Doc. No. 38-16]. The stay-at-home order was announced to take effect immediately and to remain in effect until April 6, 2020. *Id.* § 2. The stay-at-home restrictions were ultimately extended into the early summer. *See, e.g.*, Def.'s Summ. J. Ex. 22 [Doc. No. 38-24]; Def.'s Summ. J. Ex. 23 [Doc. No. 38-25].

[27] Def.'s Summ. J. Ex. 14 [Doc. No. 38-16].

[28] Resp. DSUMF ¶ 17 [Doc. No. 42-1]; Def.'s Summ. J. Ex. 13 [Doc. No. 38-15].

[29] Def.'s Summ. J. Ex. 13 [Doc. No. 38-15].

[30] Resp. DSUMF ¶ 18 [Doc. No. 42-1].

[31] *Id.* ¶ 19.

[32] Resp. PSUMF ¶ 17 [Doc. No. 45-3].

[33] Resp. DSUMF ¶ 22 [Doc. No. 42-1].

[34] Resp. PSUMF ¶ 16 [Doc. No. 45-3].

[35] Resp. DSUMF ¶ 24 [Doc. No. 42-1].

halls . . . nearly filled."[36] Despite that, many students had to maintain multiple online courses.[37] Plaintiff's tuition for the Fall 2020 semester was $28,365, roughly $1,000 more than the previous semester, and her General Fee and Health and Wellness Fee were the same as in Spring 2020.[38] Plaintiff went on to graduate from Villanova in May 2022.[39]

The parties dispute the extent to which Villanova suffered a net financial loss in fiscal years during the pandemic.[40] Plaintiff contends that it is immaterial whether Villanova lost money.[41]

### C. Procedural History

On October 6, 2023, Plaintiff filed a two-count Class Action Complaint, on behalf of herself and those similarly situated, for breach of implied contract and unjust enrichment.[42] Plaintiff defined the Class as including the following individuals:

> All Villanova University students who satisfied their payment obligations for the Spring Semester 2020 tuition and/or Mandatory Fees and enrolled in at least one in-person on-campus class (the "Class").[43]

After unsuccessfully moving to dismiss the Complaint,[44] Villanova filed an Answer,[45] and the case proceeded to discovery. On October 15, 2025, Villanova filed a Motion for Summary Judgment, and Plaintiff filed a Motion for Class Certification. That same day,

---

[36] Def.'s Summ. J. Ex. 25 [Doc. No. 38-15].

[37] *Id.*

[38] Resp. DSUMF ¶ 24 [Doc. No. 42-1].

[39] *Id.* ¶ 23.

[40] *Id.* ¶¶ 41-43.

[41] *Id.*

[42] Compl. [Doc. No. 1].

[43] *Id.* ¶ 50.

[44] *See* 6/28/24 Mem. Op. [Doc. No. 17]; 6/28/24 Order [Doc. No. 18].

[45] *See* Answer [Doc. No. 19]; Am. Answer [Doc. No. 25].

Villanova also filed a Motion to Exclude the Opinions of Dr. Gareth Macartney, an economist whom Plaintiff retained to estimate damages on a Class-wide basis regarding payments of tuition, the General Fee, and the Health and Wellness Fee.[46] The motions are briefed and ripe for review.

## II. Legal Standard

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[47] The movant has the burden of demonstrating there is no dispute of genuine material fact, which may be accomplished by showing that the nonmoving party lacks evidence to support an essential element of its cause of action.[48] A fact is "material" if its proof or disproof could affect the outcome of the action, and a dispute is "genuine" if the evidence would allow a reasonable factfinder to return a verdict in favor of the nonmoving party.[49]

In evaluating the summary judgment record, the Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in their favor.[50] However, a court may not weigh the evidence or make credibility determinations.[51] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[52] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a

---

[46] Def.'s *Daubert* Ex. 1 ¶ 10 [Doc. No. 39-2].

[47] Fed. R. Civ. P. 56(a).

[48] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Monroe v. Beard*, 536 U.S. 198, 206 (3d Cir. 2008).

[49] *Anderson*, 477 U.S. at 248.

[50] *Id.* at 255.

[51] *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[52] *Anderson*, 477 U.S. at 249-50 (citations omitted).

pointless trial in cases where it is unnecessary and would only cause delay and expense."[53] Claims withstand summary judgment if, drawing justifiable inferences in the nonmoving party's favor, the court determines that "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[54]

## III. Discussion

The Court starts by evaluating Villanova's Motion for Summary Judgment. Finding that Motion dispositive, the Court need not resolve the others.[55]

### A. Breach of Implied Contract

The premise of Plaintiff's breach of implied contract claim is that, though Villanova did not expressly agree that tuition and fee payments were for in-person learning, such a condition can be inferred from the parties' conduct and surrounding circumstances.[56] Unconvinced, Villanova cites two grounds for why this Court should enter summary judgment. First, Villanova reasons, to the extent it had a contractual obligation to provide in-person education, that obligation was discharged because performance was impossible.[57] Second, Villanova attacks Plaintiff's *prima facie* case for an implied contract, arguing that it never promised in-person instruction and that Plaintiff cannot show damages.[58]

Under the doctrine of impossibility, Pennsylvania contracts contain "an implied condition that after the making of the agreement, no law or governmental regulation will be enacted

---

[53] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[54] *Anderson*, 477 U.S. at 248.

[55] *See Jackson-Mau v. Walgreen Co.*, 652 F. Supp. 3d 349, 353-54 (E.D.N.Y. 2023) (citing *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998)).

[56] *See Elias v. Elias,* 428 Pa. 159, 237 A.2d 215, 217 (1968)

[57] Def.'s Summ. J. Br. at 11-13 [Doc. No. 38].

[58] *Id.* at 13-21.

rendering continued performance of the contract unlawful."[59] "Therefore where without fault of the party his continued performance of a contract is rendered illegal by a subsequent governmental regulation, his duty of rendering performance is discharged."[60] The doctrines of impossibility as well as "impracticability" also appear in the Restatement:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.[61]

For similar reasons, Pennsylvania courts acknowledge that impossibility is an affirmative defense that defeats an otherwise valid contract claim.[62]

The Executive Orders issued by Governor Wolf are not disputed. On March 6, 2020, Governor Wolf declared a disaster emergency.[63] Shortly thereafter, Governor Wolf shut down Pennsylvania schools for two weeks.[64] And, on Thursday, March 19, he ordered the closure of non-life-sustaining businesses,[65] which he supplemented with a March 23 stay-at-home order.[66]

---

[59] *See Burkus v. Henshall*, 126 A.2d 722, 725 (Pa. 1981) (internal quotation marks omitted); *Kasemer v. Nat'l Fuel Gas Distrib. Corp.*, 433 A.2d 851 (Pa. 1981).

[60] *Burkus*, 126 A.2d at 725 (internal quotation marks omitted).

[61] Restatement (Second) of Contracts § 261 (A.L.I. 1981); *see also id.* § 264 ("If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made."); *Kennedy v. McClarin Props., LLC*, No. 979 MDA 2018, 2019 WL 6705010, at *3 n.7 (Pa. Super. Ct. Dec. 9, 2019) (stating that Pennsylvania has adopted § 261 of the Restatement).

[62] *See Kituskie v. Corbman*, 714 A.2d 1027, 1032 n.8 (Pa. Super Ct. 1998) (listing "impossibility of performance" among affirmative defenses that should be pled as "New Matter" pursuant to a state procedural rule in Pennsylvania); *see also Bd. Comm'rs of Cnty. of Schuylkill ex rel. Gallagher v. Kantner*, 26 A.3d 1245, 1250 (Pa. Commw. Ct. 2011).

[63] Def.'s Summ J. Ex. 10 [Doc. No. 38-12].

[64] Def.'s Summ. J. Ex. 9 [Doc. No. 38-11]; *see also* Jeffrey Kolakowski, *Area School Closed in Response to COVID-19*, City of Phila. (Mar. 13, 2020), https://www.phila.gov/2020-03-13-area-schools-closed-in-response-to-covid-19/ (last visited Sept. 13, 2026); *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017) (noting a court may take judicial notice of "information [that] is publicly available on government websites").

[65] Def.'s Summ J. Ex. 10 § 1 [Doc. No. 38-12].

[66] Def.'s Summ. J. Ex. 14 [Doc. No. 38-16].

The exceptions in the March 19 and March 23 Orders for life-sustaining businesses did not apply to Villanova.[67] Moreover, Delaware County, where Villanova is located, remained shut down until June 5, 2020, when Governor Wolf finally lifted the restrictions.[68]

Villanova's actions amidst the pandemic are also undisputed. On March 11, Villanova announced a plan to suspend classes for two weeks starting on Monday, March 16.[69] On Friday, March 13, citing Governor Wolf's temporary closure of Pennsylvania schools, Villanova closed to the public, requiring students to leave campus by Sunday, March 15.[70] On March 23, Villanova announced that classes would remain online for the rest of the semester and that on-campus events would be cancelled.[71]

Given the undisputed facts, Plaintiff does not meaningfully argue that it was possible for the University to offer in-person classes after the issuance of Governor Wolf's March 19 Order. Indeed, it was not possible: Villanova would have risked subjecting itself to an enforcement action if it stayed open.[72] While the Court deferred on this issue in addressing Villanova's Motion to Dismiss,[73] the developed record shows that any duty to perform on a promise for in-person education was discharged as of March 19, by the Governor's Order.[74]

---

[67] *See* Def.'s Summ. J. Ex. 11 [Doc. No. 38-13].

[68] *See* Def.'s Summ. J. Ex. 22 [Doc. No. 38-24] (explaining that the March 23 stay-at-home order was supplemented and extended on April 1); *id.* (maintaining business-closing restrictions and stay-at-home order in Delaware County on May 7, 2020); Def.'s Summ. J. Ex. 23 [Doc. No. 38-25] (lifting restrictions on Delaware County by Governor's Order of June 5, 2020).

[69] Def.'s Summ. J. Ex. 8 [Doc. No. 38-10].

[70] Def.'s Summ. J. Ex. 9 [Doc. No. 38-11].

[71] Def.'s Summ. J. Ex. 13 [Doc. No. 38-15].

[72] *See* Def.'s Summ J. Ex. 10 § 1 [Doc. No. 38-12].

[73] *See* 6/28/24 Mem. Op. at 13-14 [Doc. No. 17].

[74] *See Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 48, 53-54 (1st Cir. 2023) (holding a university was "relieved of any contractual duty to provide in-person, on-campus instruction" by the Rhode Island Governor's COVID-19 orders declaring a statewide disaster emergency, limiting gatherings, and having individuals stay at home).

Although Villanova's first day of suspended in-person classes, Monday, March 16, took place before the issuance of the March 19 business-closure order, the undisputed facts still show Villanova's performance obligation was excused in the four-day intervening period. In Pennsylvania, "impossibility of performance 'means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, or loss involved.' "[75] Performance will become "impracticable" due to "the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made."[76] As with impossibility, this standard is objective. A discharge of obligation will not occur "if a performance remains practicable and is merely beyond a particular party's capacity to render it."[77] Sure enough, a party seeking to be excused from performance must "establish that the act contemplated under the contract is incapable of *being performed*," not just that "*he* is incapable of performing it."[78] Circumstances like a party's worsening "financial situation" or the "continuation of existing market trends" do not discharge a party's duty to perform.[79]

Here, Villanova's decision to suspend in-person courses—even before Governor Wolf had issued the business-closure order—responded to circumstances far beyond its own *subjective* incapacity to perform. Its decision arose from a once-in-a-century global pandemic that, indeed, stopped nearly all universities from offering in-person education. Moreover, the scale of the

---

[75] *Leonard v. Sec'y Pa. Dep't Hum. Servs.*, No. 24-1179, 2024 WL 5182623 (3d Cir. Dec. 20, 2024) (quoting *West v. Peoples First Nat'l Bank & Tr. Co.*, 106 A.2d 427, 432 (Pa. 1954)).

[76] *Luber v. Luber,* 614 A.2d 771, 774 (Pa. Super. Ct. 1992) (quoting Restatement (Second) of Contracts § 261); *Prusky v. Reliastar Life Ins. Co.*, 445 F.3d 695, 701 (3d Cir. 2006) (quoting *Luber* as a source of Pennsylvania law on impracticability).

[77] *Luber*, 614 A.2d at 774; *Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 948 (Pa. Super. 2004) ("[P]ersonal inability to perform the actions contemplated . . . does not rise to the level of legal impossibility.").

[78] *Luber*, 614 A.2d at 774 (emphasis added).

[79] *See* Restatement (Second) of Contracts § 261 cmt. b; *see also id.* illus. 2 (explaining that, when A contracts to produce a movie for B, but the bank with A's money fails, A remains liable for breach of contract to B).

impending pandemic was evident prior to Villanova's announcement. On March 6, 2020, Governor Wolf proclaimed a disaster emergency throughout Pennsylvania based on determinations by national and international health authorities that COVID-19 was a "public health emergency of international concern."[80] Then, Governor Wolf ordered the closure of all Pennsylvania schools for two weeks given the accelerating spread of the virus.[81] These events reflect a global health crisis of historic note, so the parties' contractual obligations were naturally premised on the "basic assumption" that such upheaval would not occur. It follows that Villanova's contractual duties were discharged at all relevant times, because performance became at first impracticable and later impossible.[82]

Plaintiff's only real argument to the contrary is that the time-limited nature of the Governor's Orders raised a question of fact about whether performance was impossible.[83] The Court disagrees. The Governor's business-closure order requiring Villanova to close remained "in effect until further notice."[84] For Delaware County, that meant until June 5, 2020, well after the Spring 2020 semester concluded.[85] Similarly, the Governor's stay-at-home order for Delaware County also remained in effect throughout the semester. Although the record does not disclose what restrictions were in place upon the hybrid restart in Fall 2020, that period is not relevant.[86]

---

[80] Def.'s Summ. J. Ex. 10 [Doc. No. 38-12].

[81] *See* Def.'s Summ. J. Ex. 9 [Doc. No. 38-11].

[82] *See Burt v. Bd. of Trs. of Univ. of R.I.*, 654 F. Supp. 3d 103, 117 (D.R.I. 2023) (awarding summary judgment to university on contract claims because duty to perform was discharged "under a combination of the doctrines of impossibility and frustration."), *aff'd*, 84 F.4th 42 (1st Cir. 2023).

[83] Pl.'s Summ. J. Opp'n at 14 [Doc. No. 42].

[84] Def.'s Summ. J. Ex. 10 § 3 [Doc. No. 38-12].

[85] *See* Def.'s Summ. J. Ex. 22 [Doc. No. 38-24]; Def.'s Summ. J. Ex. 23 [Doc. No. 38-25].

[86] Compl. ¶¶ 67, 79 [Doc. No. 1] (Plaintiff seeks recovery for conduct occurring in Spring 2020 only).

In summary, to the extent Villanova had an implied contractual obligation to provide in-person instruction, that duty was excused by the Governor's COVID-19 Orders. The Court will grant summary judgment to Villanova, and against Plaintiff, on the implied breach of contract claim.[87]

**B. Unjust Enrichment**

While the doctrines of impossibility and impracticability may excuse performance, those doctrines "do[] not entitle the party who had been obligated to perform . . . to retain the benefit provided by the other party."[88] The Court therefore turns to Plaintiff's unjust enrichment claim under Pennsylvania Law.

In Pennsylvania, the elements of an unjust enrichment claim are "that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated that benefit; and (3) the defendant retained the benefit under circumstances where it would be inequitable to do so without payment of value."[89] "[T]he most significant element of the doctrine is whether the enrichment of the defendant is unjust."[90] The "benefit" conferred must be received "at the expense of another."[91] In other words, it must be shown that the parties' transaction "confers a benefit on the defendant to the plaintiff's detriment without any corresponding exchange of value."[92] The remedy "requires the defendant to pay the plaintiff the value of the benefit

[87] The Court's resolution of the breach of implied contract claim on impossibility grounds obviates the need to consider Villanova's argument that an implied contract was never formed.

[88] *Camden v. Bucknell Univ.*, No. 23-1907, 2024 WL 760232 (M.D. Pa. Feb. 23, 2024); *see also* Restatement (Second) of Contracts § 272 (in cases governed by the rules on impracticability and frustration of purpose, "either party may have a claim for relief including restitution").

[89] *Hickey v. Univ. of Pittsburgh*, 81 F.4th 301, 316 (3d Cir. 2023) (citing *WFIC, LLC v. LaBarre*, 148 A.3d 812, 819 (Pa. Super. Ct. 2016)).

[90] *WFIC, LLC v. LaBarre*, 148 A.3d at 819 (alteration added) (internal quotations omitted).

[91] *Temple Univ. Hosp. Inc.*, 832 A.2d 501, 507 (Pa. Super. Ct. 2003) (quoting *AmeriPro Search Inc. v. Fleming Steel Co.,* 787 A.2d 988, 991 (Pa. Super. 2001)).

[92] *Villoresi v. Femminella*, 856 A.2d 78, 84 (Pa. Super. Ct. 2004).

conferred."[93] While this rule generally assesses damages from the standpoint of the recipient who was benefited,[94] in some situations that benefit may coincide with the "reasonable value of the services rendered."[95] Where, as here, a party seeks restitution because contractual performance was impracticable, the benefit's "reasonable value is appropriate" as a means to compute damages.[96]

Villanova claims that it is entitled to summary judgment on Plaintiff's unjust enrichment claim for three reasons, arranged as follows. First, Villanova contends that it was not enriched during the pandemic.[97] Second, Villanova argues that any benefit that it obtained was not to Plaintiff's detriment.[98] And, third, Villanova maintains that, if it was enriched, this was not unjust.[99] As a preliminary matter, the Court interprets all three arguments as going to the third element of unjust enrichment: whether the defendant retained the full tuition and fees under circumstances where it would be inequitable to do so without payment of value.[100] The Court first addresses the unjust enrichment claim as it relates to tuition and later discusses the claim with regard to the General Fee and Health and Wellness Fee.

---

[93] *Artisan Builders, Inc. v. Jang*, 271 A.3d 889, 892 (Pa. Super. Ct. 2022) (quoting *Durst v. Milroy General Contracting, Inc.*, 52 A.3d 357, 360 (Pa. Super. 2012))

[94] *See D.A. Hill Co. v. Clevetrust Realty Investors*, 573 A.2d 1005 (Pa. 1990) (stating in a construction case that "any benefit conferred must . . . be measured by the value of the benefit to the owner, not by the value of the invoice submitted by the contractor").

[95] *See Temple Univ. Hosp.*, 832 A.2d at 508, 510 (determining that a healthcare company was unjustly enriched by underpaying for hospital services and remanding for trial court to assess the "reasonable value" of the services the hospital rendered), *appeal denied*, 847 A.2d 1288 (Pa. 2004).

[96] Restatement (Second) of Contracts § 377 cmt. b.

[97] Def.'s Summ. J. Br. at 22-23 [Doc. No. 38].

[98] *Id.* at 21-22.

[99] *Id.* at 24.

[100] *Hickey*, 81 F.4th at 316 (explaining that the payment of tuition indisputably satisfies the first two elements of unjust enrichment: (1) conferral of a benefit; and (2) appreciation of the benefit by the defendant).

1. Net Enrichment Focuses on the Transaction with Plaintiff, Not Overall Pandemic Loss

The Court will not adopt Villanova's first argument because its conceptualization of "enrichment" is overbroad. Villanova suggests that it was not enriched because, viewing the pandemic in totality, Villanova lost money.[101] However, as the Restatement commentary advises, "the benefit that is the basis of a restitution may take any form, direct or indirect . . . . A saved *expenditure or a discharged obligation* is no less beneficial to the recipient than a direct transfer."[102] In addition, where a contractual obligation is excused by the impossibility or impracticability of performance, "net enrichment" is measured by the difference between what Plaintiff paid Villanova and the "reasonable value" of the services she received in return.[103]

True, Villanova sustained losses during the pandemic. In Spring 2020, for example, Villanova sacrificed $15,724,000 in room and board revenue, lost roughly $2,500,000 in ticket sales, and missed out on revenue from its university dining services, restaurant, and hotel.[104] In 2020-21, Villanova experienced even heavier losses, including several million dollars in costs for COVID-19 testing, hotel rentals, and classroom technology upgrades, and $32,525,026 in lost

---

[101] Def.'s Summ. J. Br. at 22-23 [Doc. No. 38].

[102] Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. d (A.L.I. 2011) (emphasis added); *see also Caring People All. v. Educ. Data Sys. Inc.*, No. 07-1267, 2008 WL 4441994, at *10 (E.D. Pa. Sept. 29, 2008).

[103] *See* Restatement (Second) of Contracts § 377 cmts. a, b (noting that to estimate the benefit retained due to impracticability of performance, the "measure of reasonable value is appropriate"); Restatement (Third) of Restitution and Unjust Enrichment § 34 cmt. c, illus. 10 (restitution equals pre-paid price less the value of services that defendant provided notwithstanding the supervening circumstance); Restatement (Second) of Contracts § 371 & cmt. a ("reasonable value" is "usually based on the market price of [the] substitute" performance); *see Temple Univ. Hosp. Inc.*, 832 A.2d 501, 507 (Pa. Super. Ct. 2003); *Ninivaggi v. Univ. of Del.*, Nos. 20-cv-1478-SB & 20-cv-1693-SB, 2023 WL 2734343, at *9 (D. Del. Mar. 31, 2023) ("I measure net enrichment by taking the amount U. Delaware received from each student and subtracting the fair market value of the services it provided to each of them."); *Ninivaggi v. Univ. of Del.*, Nos. 20-cv-1478-SB, No. 20-cv-1693-SB, 2023 WL 3092724, at *2 (D. Del. Apr. 26, 2023).

[104] Def.'s Summ. J. Ex. 27 at ECF p. 3 [Doc. No. 38-29] (full COVID-19 expense report at Villanova); Def.'s Summ. J. Ex. 29 at 91-92 [Doc. No. 38-31]. In the full expense report, Fiscal years are abbreviated ("FY").

revenue during that fiscal year.[105] However, despite those overall losses, if Villanova managed to save on an expenditure because it was excused from rendering a more costly form of instruction, that suffices for showing it has incurred a "net enrichment."[106]

Villanova also directs the Court to *Yodice v. Touro College and University System*,[107] but this case is not controlling. The district court there entered summary judgment for the university because it was undisputed that the university lost money in Spring 2020, and the plaintiff "failed to carry his burden to present evidence that the [university] was enriched."[108] But *Yodice* did not distinguish the Restatement provisions, which suggest that an impracticable situation may entitle a plaintiff to the reasonable value of any performance that went beyond that of her counterpart.[109] Nor did *Yodice* involve Pennsylvania law.[110] With that said, the sweeping financial burdens that Villanova shouldered during the pandemic are not irrelevant. Villanova's efforts amidst a generational health crisis and a drained revenue stream certainly affect whether it was unjust for it to retain any net benefit from moving classes online. The trouble for Villanova, though, is that good faith conduct alone will not bar Plaintiff's claim as a matter of law.[111] The Court views the argument as one that could be raised in a trial.

---

[105] Def.'s Summ. J. Ex. 27 at ECF p. 3 [Doc. No. 38-29].

[106] *Ninivaggi*, 2023 WL 2734343, at *9.

[107] No. 21cv2026, 2026 WL 205521, at *3 (S.D.N.Y. Jan. 27, 2026). Notice of Supp. Authority [Doc. No. 47].

[108] *Id.*

[109] *See* Restatement (Third) of Restitution and Unjust Enrichment § 34 cmt. c (given a supervening change in circumstances, "the party whose performance is more advanced has a claim in restitution"); Restatement (Second) of Contracts § 377 cmt. b.

[110] *See Hart v. Arnold*, 884 A.2d 316, 335 (Pa. Super. Ct. 2005) (noting a party who performs before the contract becomes impracticable "is generally allowed a claim for restitution to the extent his performance has benefited the other party"), *appeal denied*, 897 A.2d 458 (2006); *Caring People All., v. Educ. Data Sys.*, No. 07-1267, 2008 WL 4441994, at *10 (E.D. Pa. Sept. 29, 2008) (concluding, under Pennsylvania law, that summary judgment was not proper, as the defendant saved on certain expenses even though the deal was unprofitable); *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 449 (Pa. 1969) (holding that money saved by the defendant is a valid basis upon which for the plaintiff to claim restitution).

[111] *Hickey*, 81 F.4th at 316.

2. Villanova Was Not Enriched by Tuition Payments at Plaintiff's Expense

Villanova's second argument is that the tuition and fee payments do not imply unjust enrichment because they were not to Plaintiff's "detriment."[112] This issue calls for analysis of whether Plaintiff received something of equal value in return. If the "reasonable value" of the online education that Plaintiff received was less than her in-person education—i.e., causing a "net enrichment"[113]—she can recover the difference.[114] To get at that disparity, Plaintiff relies on (a) expert testimony and (b) qualitative descriptions of her online education. This section only concerns tuition payments. Fee payments are discussed next.

*a. Expert Testimony*

Plaintiff offers the expert testimony of Dr. Gareth Macartney, an economist who performed a regression to estimate a price discount for online education relative to in-person education.[115] To construct his model, Dr. Macartney obtained data from the National Center for Education Statistics Integrated Postsecondary Education Data System ("IPEDS"), a repository that stores data from around 6,400 institutions in the United States.[116] Using this market-wide data, he ran a regression comparing the relationship between (1) average full-time tuition charges and (2) the percentage of students studying exclusively in an online format.[117] He estimated that

---

[112] Def.'s Summ. J. Br. At 21-22 [Doc. No. 38].

[113] *See Ninivaggi*, 2023 WL 2734343, at *9.

[114] Analysis of whether remote learning and on-campus learning are of equal value could also be parsed in terms of whether Villanova suffered a "benefit," where the "benefit" is the difference between the two types of education. Here, though, the court phrases the issue in terms of whether it was at Plaintiff's expense, because that is how Villanova frames the issue. Def.'s Summ. J. Br. at 21-22 [Doc. No. 38]. Regardless of how the issue is presented, the focus is on whether Villanova retained some excess value for which it did not compensate Plaintiff.

[115] Def.'s Summ. J. Ex. 28 ¶¶ 42-56 [Doc. No. 38-30].

[116] *Id.* ¶ 45.

[117] *Id.* ¶¶ 49-51. According to Dr. Macartney, his regression model controlled for institutional variables like standardized test scores, geography, student body population, and student-to-faculty ratio. *Id.* ¶ 50.

the value of full-time remote learning was approximately 26.2 percent less than the value of in-person learning.[118]

At summary judgment, however, courts generally disregard market-wide valuations of online education in favor of the university's own pricing model.[119] In *Michel v. Yale University*, another COVID-19 refund case, the plaintiff also retained Dr. Macartney to support his claim for tuition and fee refunds in unjust enrichment.[120] Dr. Macartney proposed to estimate the value disparity between in-person and online education in Spring 2020 "either by relying on data from different colleges' tuition and fees and the different institutions' attributes" or "on data stemming from surveys of the preferences of Yale students."[121] The *Yale* court discounted these modes of analysis, noting that they "would ignore that Yale has assessed the value of its in-person and online offerings prior to the pandemic and opted to charge students an identical fee for either mode of instruction."[122] Put another way, "attempting to divine a difference in market value from competitors is unavailing where Yale's pricing model has previously rejected a value disparity for the in-person and remote educational opportunities it provides."[123]

In *Suffolk University Covid Refund Litigation*, a District of Massachusetts court followed the same approach. There, the court held that the plaintiffs could proceed to trial on their tuition claims only to the extent "(1) that Suffolk has a particular method for calculating the cost difference between its online and in-person programs and apply that method of calculation to the

[118] *Id.* ¶ 52.

[119] *See Michel v. Yale Univ.*, No. 3:20-CV-1080 (JCH), 2023 WL 1350220, at *6-8 (D. Conn. Jan. 30, 2023); *In re Suffolk Univ. Covid Refund Litig.*, 616 F. Supp. 3d 115, 117-18 (D. Mass. 2022).

[120] *Michel*, 2023 WL 1350220, at *7.

[121] *Id.* (internal quotation marks omitted).

[122] *Id.*

[123] *Id.*

in-person undergraduate program; or (2) that a consistent cost differential—either across school years or across programs—exists between the online and in-person versions of Suffolk's other educational programs (such as the MBA) and apply that differential to the in-person undergraduate programs."[124] At summary judgment, it was undisputed that undergraduate course pricing at Suffolk was the same for both online and in-person courses, and the court noted that Suffolk did not have an online-only undergraduate program.[125] With respect to graduate courses, though, the summary judgment record indicated that Suffolk's in-person MBA cost $1,519 per credit in 2019-20 while its online MBA cost only $1,171 per credit.[126] Because the university's pricing model reflected a difference in value—which it did not in *Yale*—the court determined that summary judgment was not justified.[127] But the court cautioned that the "[p]laintiffs will not be permitted to utilize market-value data of sister programs at other institutions to measure the cost difference," as "there is only one Suffolk University in downtown Boston."[128] The Court finds this reasoning, also echoed in *Yale*, to be persuasive. No reasonable factfinder could determine the "going rate" of online education at Villanova by an apples-to-oranges comparison to other universities when Villanova has already set a model for how the product is valued.

As a result, the Court is compelled to discount Dr. Macartney's market-wide model. His model accounts for the fact that institutions like American University, Georgetown University, and Williams College downgraded the price of tuition when the pandemic required a transition to

---

[124] *Suffolk Univ. Covid Refund Litig.*, 616 F. Supp. 3d at 118.

[125] *Id.* at 117-18.

[126] *Id.* at 118.

[127] *Id.*

[128] *Id.; see also Nguyen v. Stephens Inst.*, No. 20-cv-4195, 2023 WL 11113887, at *2 ("The most straightforward indicator of the market price with respect to the contract at issue is the price designated in the contract," so "Plaintiff did not suffer in Spring 2020 as a result of his classes going completely online").

remote education (Georgetown reduced tuition by 10% for undergraduate students and 5% for graduate students in Fall 2020, respectively).[129]

But Villanova did not. In the 2019-20 academic year, which was key in *Yale* and *Suffolk*, Villanova charged an undergraduate tuition of $27,275 per semester, plus fees including the General Fee and Health and Wellness Fee.[130] Those costs did not change based on whether a student enrolled in online courses or how many online courses he or she chose.[131] At the graduate level in 2019-20, the record is also telling. Villanova's pricing model shows that some graduate programs were *more expensive* when offered online. Unlike in *Suffolk*, the online version of Villanova's MBA program actually cost *more* than other versions.[132] And the 2019-20 "[o]n-campus" Tax Law LLM program cost $1,250 per credit, whereas the 2019-20 "[o]n-line" Tax Law LLM program was $1,525 per credit.[133] In the Fall 2020 semester, the trend persisted. Although Dr. Macartney quotes that institutions like Georgetown and Williams lowered their tuition, Villanova did the opposite—raising its Fall 2020 tuition to $28,365.[134] Since Dr. Macartney's opinions are at odds with Villanova's decision to reject a discount for online education—and, indeed, its surcharge for online graduate programs—his testimony is inapt to prove the value of Villanova's online instruction in Spring 2020.[135]

---

[129] Def.'s Summ. J. Ex. 28 ¶ 33, table 2 [Doc. No. 38-30].

[130] Def.'s Summ. J. Ex. 4 at 36 [Doc. No. 38-6].

[131] *Id.*; Def.'s Summ. J. Ex. 3 at 23:23-24:2 [Doc. No. 38-5].

[132] Def.'s Summ. J. Ex. 29 at ECF p. 112 [Doc. No. 38-31]; Def.'s Summ. J. Ex. 26 at 7 [Doc. No. 38-28].

[133] Def.'s Summ. J. Ex. 29 at ECF p. 112 [Doc. No. 38-31]; Def.'s Summ. J. Ex. 26 at 4 [Doc. No. 38-28].

[134] Def.'s Summ. J. Ex. 29 at ECF p. 112 [Doc. No. 38-31].

[135] *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) ("[W]hen indisputable record facts contradict or otherwise render the [expert] opinion unreasonable, it cannot support a jury verdict." (internal quotation marks omitted)).

*b. Descriptions Involving Quality of Education*

Plaintiff also offers her own descriptions as a source of evidence indicating that her remote education was of diminished value.[136] In her deposition, Plaintiff testified that some professors "struggled a little bit more with the online format" and that those courses "didn't meet as frequently and didn't go as in-depth."[137] She testified that the impact of remote learning was felt in her business analytics course, which involved "weekly group projects" that were difficult to manage without an in-person structure.[138] Plaintiff also explained that she felt "isolated to [her] own computer" and that she lacked the opportunity "to collaborate in person."[139] Beyond coursework, Plaintiff noted that she participated in on-campus programs like intramural basketball, club swim, tutoring services at the Falvey Library Writing Center, and Villanova's Division 1 Mascot Team, which she lost access to when her education was moved online.[140]

However, even viewing this evidence under the favorable presumption Plaintiff is owed, her perceptions do not rebut the evidence that Villanova's online instruction was at least of equal value. In each academic year, Villanova's Board of Trustees sets tuition and fee rates based on budgetary needs, strategic incentives, salary progressions, and other factors.[141] In that process, Villanova elected not to discount online courses for the 2019-20 academic year.[142] And, more importantly, it elected to charge higher tuition for the 2020-21 academic year, even though some

---

[136] *See generally* Pl.'s Summ. J. Opp'n at 6 [Doc. No. 42].

[137] Pl.'s Summ. J. Ex. L at 196:8-15 [Doc. No. 42-14].

[138] *Id.* at 199:5-13.

[139] *Id.* at 79:19-24.

[140] *See* Pl.'s Summ. J. Ex. N at Interrogatory 4 [Doc. No. 42-16].

[141] Def.'s Summ. J. Ex. 3 at 17:23-18:14 [Doc. No. 38-5].

[142] Def.'s Summ. J. Ex. 3 at 23:24-24:2 [Doc. No. 38-5]; Def.'s Summ. J. Ex. 4 at 36 [Doc. No. 38-6].

concerns that Plaintiff cited were expected to persist in the hybrid learning model that was designed.[143]

Confronted by this evidence, Plaintiff argues that Villanova's pricing decisions are not dispositive since, aside from Spring 2020, Villanova was never fully online for undergraduates.[144] But, in *Yale*, the absence of a fully online undergraduate program did not overshadow the fact that Yale otherwise priced online instruction equally. Nor does that detail matter here. Plaintiff appears to suggest that a fully online semester at Villanova is of lesser value even if online instruction is priced equally on a course-for-course basis. That contention is simply not borne out in the record: Villanova offers several fully remote graduate programs which, despite being fully online, cost the same, or more, as compared to the versions with in-person instruction.

*c.* Hickey *Does Not Warrant Denial of Summary Judgment*

Finally, though Plaintiff protests otherwise,[145] the Third Circuit's decision in *Hickey* does not predict a different result. There, the Third Circuit focused on the third element of unjust enrichment: whether it was unjust for the universities to retain the tuition and fees in full. At the motion to dismiss stage, the *Hickey* court determined that the plaintiffs plausibly supported this element by alleging "the Universities retained considerable cost savings—at Students' expense—by transitioning to remote learning."[146] However, it warned that the long-term success of the

---

[143] Def.'s Summ. J. Ex. 1 at 220:13-21 [Doc. No. 38-3] ("[Questions directed at Plaintiff] Q. Okay. But you understood . . . that [Fall 2020] classes were going to be a mix of things; right? A. Yes. Q. And you understand that the experience at Villanova was going to be different because of COVID? A. Yes."); *id.* at 221:17-20 (Q. "And, in fact, you knew that certain classes would be held online . . . in fall of 2020, right? A. Yes."); Def.'s Summ. J. Ex. 25 [Doc. No. 38-27] (noting that online courses were still common in Fall 2020—"[a]pproximately 60% of our students have three or fewer online courses").

[144] *See* Pl.'s Summ. J. Opp'n at 13 n.2 [Doc. No. 42].

[145] Pl.'s Summ. J. Opp'n at 13 [Doc. No. 42].

[146] *Hickey*, 81 F.4th at 316.

plaintiffs' cases would turn on fact-intensive questions like whether "the school saved money by substituting online for in-person classes" and "whether the transition to online learning resulted in a net enrichment to the universities."[147]

Examined carefully, the record here yields no dispute of material fact as to whether Plaintiff's tuition payments enriched Villanova, and that holding is premised on undisputed evidence that education at Villanova was not worth less online than it was in person. It bears mention that Plaintiff also did not supply evidence from which a juror could infer the "overhead necessary to provide classes."[148] These were the sort of issues that this Court flagged as affecting whether unjust enrichment was a viable theory of recovery.[149] It raises no inconsistency with this Court's prior decision, or with *Hickey*, to conclude that Plaintiff's evidence fell short of creating a triable dispute.[150]

In conclusion, the undisputed record evidence does not raise a triable issue of fact as to whether Plaintiff's online education in Spring 2020 was worth less than what she paid. She has not adduced sufficient evidence for a reasonable factfinder, viewing the facts in her favor, to

---

[147] *Id.* (quoting *Ninivaggi v. Univ. of Del.*, 555 F. Supp. 3d 44, 53 (D. Del. 2021) (first); and *Shaffer v. George Washington Univ.*, 27 F.4th 754, 764 (D.C. Cir. 2022) (second) (alteration omitted)).

[148] *Id.* at 316-17.

[149] *See* 6/28/24 Mem. Op. at 15-16 [Doc. No. 17].

[150] In its third argument, *see supra* p. 14, Villanova argues that its retention of students' tuition and fees was not unjust for two additional reasons. First, it underscores the "remarkable feat" it accomplished by ensuring a safe transition at substantial institutional cost. Def.'s Summ. J. Br. at 24 [Doc. No. 38]. And, second, Villanova compares the present situation to a pre-COVID Western District of Pennsylvania decision, citing a Pennsylvania case—*Hahn v. Andrews*, 126 A.2d 519, 521 (Pa. Super. Ct. 1956). Def.'s Summ. J. Br. at 24 [Doc. No. 38]. While the Court will grant summary judgment for the reasons outlined in this Opinion, the Court notes its disagreement with these arguments. The first argument does not persuade the Court because, as explored earlier, *Hickey* forecloses the notion that the correctness of Villanova's pandemic response bars recovery as a matter of law. *Hickey*, 81 F.4th at 316. The second argument also fails, as the quotation in *Hahn* describes a situation where the plaintiff attempted to rescind an otherwise valid contract, and where the court saw breach-of-contract damages as the appropriate remedy. Since relief in contract is impossible here, the Court would conclude that *Hahn* is distinguishable.

conclude that she conferred a benefit on Villanova at her expense. Without more, the unjust enrichment claim is unsustainable.

3. The Record Lacks a Triable Dispute as to Whether Villanova Was Unjustly Enriched by the Fee Payments

A similar result applies for Plaintiff's fee-based claim. To reiterate, the purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."[151] First, the movant may satisfy its initial burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."[152] Then, the nonmovant must produce evidentiary materials that "show[] that there is a genuine issue for trial."[153] If, making reasonable inferences against the movant, the Court finds no genuine dispute of material fact, summary judgment is proper.[154] This upholds the "purpose of . . . avoid[ing] a pointless trial in cases [that] would only cause delay and expense."[155]

Measured against these standards, Plaintiff's fee-based claim lacks the evidentiary rigor needed to proceed to trial. Because the General Fee and Health and Wellness Fee were *benefits* that Villanova *appreciated*, the issue is whether the reasonable value of the services Plaintiff received for the fees was less than she paid—or, as Villanova puts it, whether Plaintiff suffered a financial detriment.[156] Villanova met its burden by averring an absence of evidence as to whether

[151] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).

[152] *Celotex*, 477 U.S. at 325.

[153] *Id.* at 324 (internal quotation marks omitted).

[154] *Anderson*, 477 U.S. at 248-49.

[155] *Walden*, 323 F. Supp. 2d at 641 (citing *Goodman*, 534 F.2d at 573).

[156] *Cf. Hickey*, 81 F.4th at 316 (noting that the (1) benefit and (2) appreciation are the first two elements of an unjust enrichment claim in Pennsylvania).

Plaintiff experienced a detriment.[157] So, the Court must ask if Plaintiff met the countervailing burden of presenting evidence to create a genuine dispute.

She has not. For one thing, the statements of material fact do not contain a description of which services were included in the fees. Not even Villanova's 463-page course catalog clarifies this.[158] Without that starting point, no judge or jury can have a competent basis upon which to assess Villanova's modifications to student services.

Beyond that, the record lacks any evidence that enrichment occurred. Although the Complaint states that "[m]ost of the services for which the Mandatory Fee was assessed were . . . terminated,"[159] that allegation is not connected to record evidence, making it inapposite for purposes of summary judgment.[160] Indeed, the only would-be evidence that Plaintiff advances is Dr. Macartney's report, which calculated that Villanova experienced a windfall of $1.7 million by collecting the two fees and withholding student services.[161]

Yet the assumption that Villanova did not provide student services after the shutdown is unsupported, and inaccurate. The President of Villanova sent students a March 23, 2020 letter explaining that student services centers would remain "available to assist students" and that staff from "Learning Support Services, the Student Health Center, Student Life, [and] Campus Ministry or Counseling Center" would be "available and ready to help."[162] Plaintiff does not rebut the notion that these centers remained active. Consequently, the only way she could show

[157] *See, e.g.*, Def.'s Summ. J. Br. at 21-22 [Doc. No. 38].

[158] *See* Pl.'s Summ. J. Ex. O at 27, 108 [Doc. No. 42-17] (mentioning laboratory fees, activity fees, library fees, and medical fees without saying if these are related to the General Fee and the Health and Wellness Fee); *id.* at 36 (identifying the General Fee and Health and Wellness Fee but not specifying what they cover).

[159] Compl. ¶ 38 [Doc. No. 1]; *see also id.* ¶¶ 41, 46.

[160] *See Celotex*, 477 U.S. at 324.

[161] Pl.'s Summ. J. Ex. M ¶¶ 54-56 & table 7 [Doc. No. 42-15].

[162] Def.'s Summ. J. Ex. 13 at VU_00000086 [Doc. No. 38-15].

Villanova was enriched is by subtracting the fair market value of the modified services from the fees she paid. But calculating fair market value is "far from [easy]."[163] Further, Plaintiff has not attempted to prove it here. Dr. Macartney's regression was limited to tuition,[164] and Plaintiff failed to present evidence to assess fair market value by any other means. Because the record lacks competent evidence from which a factfinder could conclude that Villanova was enriched, summary judgment is warranted.[165]

## IV. CONCLUSION

For the foregoing reasons, Defendant Villanova University's Motion for Summary Judgment will be granted. The Court need not resolve the merits of Villanova's Motion to Exclude and Plaintiff's Motion for Class Certification. Those Motions will be dismissed as moot. An Order follows.

[163] *Ninivaggi*, 2023 WL 2734343, at *9.

[164] Pl.'s Summ. J. Ex. M ¶ 49 [Doc. No. 42-15] (explaining that the "relationship of interest is between . . . full-time average *tuition* charges and the . . . percentage of students that study exclusively in distance education courses." (emphasis added)).

[165] *See Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (affirming summary judgment for university on fees where university provided services "albeit often remotely or with adaptations," and where plaintiffs "adduced no evidence that might support a showing that [the university] unjustly benefited from these funds."); *In re Suffolk Univ. Covid Refund Litig.*, 616 F.3d at 117 (granting summary judgment as to the plaintiffs' fee-based claims for breach of contract and unjust enrichment because the fees did not mention a "connection to an in-person educational experience"); *Aiken Indus., Inc. v. Est. of Wilson*, 383 A.2d 808, 812 (Pa. 1978) (stating that although "recovery will be sustained even though such amount cannot be determined with entire accuracy," it must be the case that "the amount may be fairly estimated from the evidence"). As an aside, Pennsylvania courts are generally reluctant to affirm summary judgment on breach of contract claims where damages appear indefinite. *See Carroll ex rel. Burbank v. Phila. Hous. Auth.,* 650 A.2d 1097, 1100 (1994); *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984). However, the Court concludes that this consideration does not preclude summary judgment on the unjust enrichment claim here, for which nominal damages are not at issue. *See Thorsen*, 476 A.2d at 931 (affirming summary judgment for defendant where nominal damages were not claimed).